UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

----------------------------------------------------------------------X

MARY ROONEY, Administrator of the Estate of
PATRICK ROONEY,

                                 Plaintiff,

      v.-

**MEMORANDUM & ORDER**
14-cv-6220 (JMA) (AKT)

UNITED STATES OF AMERICA,

                                 Defendant.

----------------------------------------------------------------------X

**APPEARANCES:**

Mitchell K. Aaron
Torgan & Cooper, P.C.
17 State Street – 39th Floor
New York, NY 10004
     *Attorney for Plaintiff*

Matthew R. Kundinger
John J. Bowers
William G. Powers
Michele S. Greif
United States Department of Justice
Civil Division, Torts Branch – Environmental Torts
1331 Pennsylvania Ave., NW, Ste. 800-S
Washington, DC 20004
     *Attorneys for Defendant*

FILED
CLERK

03/20/2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Plaintiff Mary Rooney, as administrator of the estate of her son, Patrick Rooney, brings this suit in tort against the United States of America pursuant to the Federal Torts Claims Act (the "FTCA"). Patrick Rooney was employed by East End Environmental Services, which had been engaged as a sub-sub-contractor of the United States Coast Guard and tasked with the removal and disposal of three fuel storage tanks. While Patrick Rooney was cutting into one of the tanks, it exploded and fatally injured him. In her complaint, plaintiff alleges that the explosion was the

result of the undisclosed presence of gasoline in the tank.

The United States moves to dismiss the complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Specifically, the United States argues that plaintiff has failed to allege that negligence on the part of any of its employees caused the explosion and that, by the terms of the FTCA, the Court therefore lacks subject matter jurisdiction.

For the reasons stated below, the Court finds that plaintiff has failed to allege that a negligent act by a United States employee caused the explosion that killed the decedent. The United States' motion to dismiss for lack of subject matter jurisdiction is therefore granted.

## I.     BACKGROUND

The decedent was employed by East End Environmental Systems ("East End"), which was hired to remove and dispose of three used fuel tanks at a United States Coast Guard station on Long Island. East End itself never contracted directly with the Coast Guard; rather, East End's engagement stemmed from a contractual relationship between the United States Coast Guard and Campbell Construction ("Campbell") that began when those entities entered into a Regional Multiple Award Construction Contract ("RMACC") on November 16, 2009. (RMACC, ECF No. 36-3.) An RMACC is a document that governs the overarching relationship between the Coast Guard and an independent contractor and "sets the terms . . . for all projects executed under its authority." (Declaration of Jean Bretz, date September 1, 2015, ("Bretz Dec.") ¶ 2, ECF No. 36-2.) The "specific terms of specific projects" performed under the authority of an RMACC are memorialized in individual "Task Orders." (Id.) The RMACC included provisions allowing the Coast Guard to oversee Campbell's performance and requiring Campbell to provide the Coast Guard with regular updates, but it did not provide for any direct supervision or control by Coast Guard employees over Campbell's operations. (See id. at USCG-PROV02_03398; see also Bretz Dec. at ¶¶ 11, 14.)

2

The RMACC also required Campbell to "take all reasonable safety and health measures" on any projects to which it applied. (RMACC at USCG-PROV02_03404.) Among other things, the RMACC required Campbell to comply with "all applicable Federal, state and local laws, regulations, ordinances, codes and orders relating to safety and health in effect on the date of this contract." (Id.) Further, the RMACC obligated Campbell to insert the "health and safety clause" of the RMACC into "subcontracts of every tier" in which Campbell "determines that hazardous materials or operations are involved." (RMACC at USCG-PROV02_03405.)

In particular, the RMACC noted that all "State and Federal Occupational Safety and Health Administration (OSHA) standards are included in this contract in full force and effect, and the most stringent of the standards will apply." (Id. at USCG-PROV02_03408.) In relevant part, the OSHA regulations concerning the disposal of used fuel containers dictate that "[n]o welding, cutting, or other hot work shall be performed on used drums, barrels, tanks or other containers until they have been cleaned so thoroughly as to make absolutely certain that there are no flammable materials present or any substances such as greases, tars, acids, or other materials which when subjected to heat, might produce flammable or toxic vapors." 29 C.F.R. 1910.252(a)(3)(i).[1]

In August 2012, the Coast Guard issued a Task Order to Campbell concerning, among other things, the removal and replacement of three oil storage tanks from the Coast Guard Station at Jones Beach. (Task Order, ECF No. 36-4, at USCG-PROV02_04381.) The Task Order indicated that Campbell was required to "provide all labor, materials, equipment, transportation, supervision and disposal necessary to remove/replace" the three tanks. (Id. at USCG-PROV02_04380; 04402–5.) Campbell had full responsibility for ensuring completion of the project. (See, e.g., id. at USCG-PROV02_04402–5.) After receiving the Task Order, Campbell

---

[1] Plaintiff has not argued that either Number 2 Fuel Oil or gasoline falls outside of the substances enumerated by this OSHA regulation.

contracted with Lemelin Environmental Services ("Lemelin"), which then contracted with East End to "remove and dispose of three above-ground tanks from the" Coast Guard station at Jones Beach. (Compl. ¶ 12; see also Bretz Dec. ¶¶ 12, 13.) The only facts relevant to this case concern a 1,500 gallon tank, which was one of the three tanks to be removed.

In anticipation of the removal of the 1,500 gallon tank, the Coast Guard transferred a portion of its contents to a 500 gallon temporary tank. (See Deposition of Peter Chetuck 130:24– 131:9.) On December 10, 2012, Francis Rooney—East End's owner, and the decedent's father— transferred the remaining contents of the 1,500 gallon tank into East End's "pump truck." (Affidavit of Francis Rooney, dated April 20, 2016, ("Rooney Aff.") at ¶ 5, ECF No. 36-11.)

After East End drained the 1,500 gallon tank, "approximately 3 inches of sediment/sludge was left at the bottom of the tank." (Id.) Francis Rooney stated that this was "completely within industry-wide standards and guidelines for tanks containing #2 heating oil." (Id. at ¶ 4.) Francis Rooney further stated that, contrary to the requirements set out in the RMACC and applicable OSHA regulations, there was "no need to either drain off the remaining sediment/sludge or wipe down and purge the 1,500 gallon tank any further before disposal, because #2 heating oil never explodes, nor does it emit vapors which are in any way flammable or combustible." (Id. at ¶ 6.) Francis Rooney also stated that "at no time . . . did [the] Coast Guard site inspector . . . advise, recommend, demand, insist, or order me to remove the remaining sediment/sludge from the bottom of the tank or to thoroughly clean and purge its interior." (Id. at ¶ 7.) Francis Rooney stated that, had he been informed that there was gasoline in the tank, he would have thoroughly cleaned the tank before cutting it apart. (Id. at ¶ 8.) Francis Rooney further stated that a thorough cleaning of the tank "would have eliminated the risk of an explosion and prevented it entirely." (Id.)

After draining the tank, East End employees transported it from the Coast Guard station to

East End's facility.  (Id. at ¶ 7.)  On December 11, 2012, "Patrick Rooney was cutting the 1,500 gallon tank with a saw" when the tank exploded, fatally injuring him.  (Compl. ¶ 15.)  East End was subsequently cited by OSHA for a number of "serious" violations arising out of the accident.  (Citation and Notification of Penalty, ECF No. 36-14.)  In particular, the OSHA citation noted that, contrary to applicable regulations, "[w]elding, cutting, or other hot work was performed on used drums, barrels, tanks or other containers that had not been cleaned so thoroughly as to make absolutely certain there were no flammable materials present."  (Id. at EastEnd_00104.)

About a month after the explosion, Francis Rooney hired a chemical analysis firm to test a sample of the oil that had been pumped from the 1,500 gallon tank into East End's pump truck.  (See Rooney Aff. ¶ 9; Laboratory Report, ECF. No. 36-13.)  The results indicated that the fuel in the pump truck contained 2,320 mg/kg "Gasoline Range Organics," and 2,280,000 mg/kg "Diesel/Fuel #2."  (Laboratory Report at EastEnd_00119.)  That is, the report indicated that the fuel in the pump truck was approximately .23% gasoline.  (Id.)[2]  Francis Rooney also attempted to test samples taken from the exploded 1,500 gallon tank in order to confirm that the fuel in the pump truck originated in the tank, but the report indicated that "no petroleum products were present in the residue obtained from the interior of the [exploded 1,500 gallon] tank" and, therefore, concluded that "no correlation could be made between the tank and the liquid."  (Id. at EastEnd_00117.)  In his affidavit, Francis Rooney stated that he notified the Coast Guard site inspector of these results.  (Rooney Aff. ¶ 10.)  Francis Rooney also stated that the site inspector had notified his superior and that a sample of fuel from the 500 gallon temporary tank at the Coast

---

[2] Neither party addresses the fact that these results appear to indicate that the tested sample consisted of 228% Number 2 Fuel Oil, a facially nonsensical result.  As neither party's argument relies on the relative composition of the tested sample, the Court interprets the report as demonstrating that the contents of the pump truck—which ostensibly originated in the 1,500 gallon tank—contained a small but measurable quantity of gasoline.

Guard station had been taken for testing.  (Id. at ¶ 11.)  The record is unclear on whether such testing ever occurred.[3]

On October 23, 2014, plaintiff filed the instant suit.  Between April 2015 and August 2015, the parties conducted targeted discovery concerning the existence of subject matter jurisdiction. The United States subsequently moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.    DISCUSSION

The parties dispute whether the Court has subject matter jurisdiction over plaintiff's claims. That question turns on two subsidiary issues.  First, the Court must determine whether Campbell, Lemelin, and East End qualify as an "independent contractors" under the FTCA.  If they so qualify, then the Court lacks jurisdiction over plaintiff's claims insofar as they arise from the negligence of any of the contractors.  The FTCA's waiver of sovereign immunity still applies to any claims arising from the alleged negligence of a government employee, however, and so the Court must next determine whether plaintiff has alleged that the accident was the result of an independent negligent act or omission on the part of a government employee.

As discussed below, the Court first finds that Campbell, Lemelin, and East End all operated as independent contractors and were not agents or employees of the government.  Next, the Court finds that plaintiff has failed to allege that the accident was caused by the negligence of a government employee.  Under New York law and the terms of the RMACC and Task Order, the government had no duty of care to the decedent.  Even assuming that any such duty existed,

---

[3] Plaintiff appears to suggest that the government has suppressed or destroyed evidence of such testing but has made no formal allegations of spoliation.  (See Pl's Opp. at 10.)  For the purposes of this motion, the Court has assumed that the 1,500 gallon tank contained a small but measurable quantity of gasoline.

however, plaintiff has not alleged facts sufficient to find that the government breached that duty, given the unambiguous delegation of all safety responsibilities to the contractors.

Plaintiff has also argued that the government is liable for the negligence of its independent contractors because, under New York law, safety responsibilities in situations involving "special dangers" are non-delegable. This argument is an impermissible attempt to impose strict liability on the government for the actions of third parties. The FTCA waives the federal government's sovereign immunity <u>only</u> for claims arising out of the negligence of a government employee acting within the scope of her employment. The Court thus lacks jurisdiction over any strict liability claim against the government.

## A. <u>Subject Matter Jurisdiction Generally</u>

"A case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), a district court "'must accept as true all material factual allegations in the complaint' but 'refrain from drawing from the pleadings inferences favorable to the party asserting [jurisdiction].'" <u>Clarke v. United States</u>, 107 F. Supp. 3d 238, 243 (E.D.N.Y. 2015) (quoting <u>Fox v. Commonw. Worldwide Chauffeured Transp. of NY, LLC</u>, No. 08–cv–1686, 2009 WL 1813230, at *1 (E.D.N.Y. June 25, 2009)). A district court inquiring into the existence of subject matter jurisdiction may also "refer to evidence outside the pleadings," such as affidavits or other evidence. <u>Id.</u> (citing <u>Kamen v. American Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986)).

## B. <u>Subject Matter Jurisdiction Under the Federal Tort Claims Act</u>

Plaintiff asserts four tort claims against the United States. "Under traditional principles of sovereign immunity, the United States is immune from suit except to the extent the government

has waived its immunity." Ireland v. Suffolk Cty. of N.Y., 242 F. Supp. 2d 178, 185 (E.D.N.Y. 2003). By enacting the FTCA, Congress "waive[d] the sovereign immunity of the federal government for claims based on the negligence of its employees." Id. at 185.

The FTCA constitutes a limited statutory waiver of sovereign immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Unless a tort claim against the United States falls within the provisions of the FTCA, the courts lack subject matter jurisdiction over that claim. See United States v. Orleans, 425 U.S. 807, 813 (1976). Further, the "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Liranzo v. United States, 690 F.3d 78, 84 (2d Cir. 2012) (quoting Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005)). The Second Circuit has recognized that the FTCA's waiver of sovereign immunity is "to be strictly construed in favor of the government." Liranzo, 690 F.3d at 84 (quoting Long Island Radio Co. v. NLRB, 841 F.2d 474, 477 (2d Cir. 1988)).

### 1.   The Independent Contractor Exception

The FTCA contains numerous exceptions. If the conditions of any exception are met, the FTCA's waiver of sovereign immunity does not apply and federal courts lack jurisdiction over the claim. As relevant to the situation before the Court, "the federal government may not be held liable for a negligent or wrongful act or omission of an independent contractor even where state law would impose liability" in situations "where the United States is wholly without fault." Haskin v. United States, 569 F. App'x 12, 15 (2d Cir. 2014) (quoting Roditis v. United States, 122 F.3d 108, 111 (2d Cir. 1997)). The government argues that it delegated full responsibility for the safe

completion of the project to independent contractors and, therefore, any negligence that "led to the death of Mr. Rooney" was "related to the conduct of a contractor, not the government."  (Gov't Mem. at 13.)

Whether an entity qualifies as an independent contractor under the terms of this exception turns on the relationship between that entity and the government, and courts ordinarily look to the terms of the contract in deciding this question.  See Moreno v. United States, 965 F. Supp. 521, 524 (S.D.N.Y. 1997); Williams v. United States, 50 F.3d 299, 305 (4th Cir. 1995).  "Specifically, there are two primary factors that distinguish an agent from an independent contractor: (1) the power of the federal Government to control the detailed physical performance of the contractor and (2) whether the Government supervises the day-to-day operations of the contractor."  Hentnik v. United States, No. 02-cv-9498, 2003 WL 22928648, at *4 (S.D.N.Y. Dec. 10, 2003) (internal alterations omitted) (quoting Moreno, 965 F. Supp. at 525).  In situations where the government "reserves the right to inspect the contractors' performance only to ensure compliance with the terms of the contract," but does not have the "contractual right to control the contractors' physical performance or supervise [their] day-to-day operations," the government cannot be liable for the contractor's negligence.  Id.

Here, the allegations in the complaint and the documents before the Court establish that East End was an independent contractor rather than an agent or employee of the government.  As an initial matter, East End never had any direct relationship with the government.  Rather, the RMACC and Task Order delegate day-to-day operational control to Campbell.

In addition to delegating full operational control to Campbell, the unambiguous terms of the RMACC and Task Order also delegated the responsibility for complying with applicable health and safety standards to Campbell.  Campbell was further obligated to ensure that these same

responsibilities were imposed on sub-contractors (or sub-sub-contractors).[4]  The mere fact that the government "reserve[d] the right to inspect the contractors' performance [in order] to ensure compliance with the terms of the contract," therefore, does not defeat a finding that East End is an independent contractor.  See Hentnik, 2003 WL 22928648 at *4.

Because Campbell, Lemelin, and East End were independent contractors, the Court lacks subject matter jurisdiction over plaintiff's claims to the extent that those claims stem from the alleged negligence of a contractor or its employees.

### 2.  Alleged Direct Actions of Government Employees

Plaintiff argues that subject matter jurisdiction exists because the alleged acts of government employees rise to the level of negligence.  In particular, plaintiff argues that the government owed the decedent a duty of care and that it breached that duty by allowing the introduction of gasoline into the 1,500 gallon tank and either failing to notify East End of this fact or affirmatively representing that the 1,500 gallon tank contained only Number 2 Fuel Oil.

Whether alleged acts and omissions constitute negligence is a question of New York law.  See 28 U.S.C. §§ 1346(b)(1), 2674; see also Suro v. United States, 107 F. Supp. 2d 206, 208 (E.D.N.Y. 2000).  The elements of negligence under New York law are: (a) the existence of a legal duty to the plaintiff; (b) a breach of that duty; (c) proximate causation; and (d) damages.  See Luina v. Katharine Gibbs Sch. N.Y., Inc., 37 A.D.3d 555, 556 (App. Div. 2d Dep't 2007) (citing Eiseman v. State of New York, 70 N.Y.2d 175 (N.Y. 1987)); see also In re Lake George Tort Claims, 461 F. App'x 39, 40 (2d Cir. 2012) (quoting Merino v. N.Y.C. Transit Auth., 218 A.D.2d 451, 457 (App. Div. 1st Dep't 1996)).  Thus, in order to allege negligence by a government employee, a plaintiff must allege facts sufficient to establish each of these elements.

---

[4] Plaintiff does not contest either that Campbell was obligated to impose the relevant health and safety responsibilities on East End or that East End did, in fact, bear such obligations.  (See RMACC at USCG-PROV02_03405.)

As discussed below, plaintiff has failed to allege facts sufficient to find that the government owed the decedent a duty of care.  And, even assuming that such a duty existed, plaintiff's allegations are insufficient to find that the government breached that duty.

### a.  The Court Rejects Plaintiff's Argument That the Government Owed Her Decedent a Duty of Care

Plaintiff argues that the government owed a duty of care to the decedent under a line of New York cases purportedly holding that "a plaintiff not a party to a contract can establish a duty of care arising from a contract (1) where the promisor unleashes a force or instrument of harm while fulfilling its contractual obligations, (2) where the third-party reasonably relies on the promisor's continuing performance of the contractual obligation and suffered injury as a result, [or] (3) where the promisor took over and displaced the promisee's duty to a third-party."  (Pl's Opp. at 17 (citing Church ex rel. Smith v. Callanan Indus., Inc., 99 N.Y.2d 104, 110–111 (N.Y. 2002).)  Plaintiff argues that the first and third situations apply here and, therefore, that the government owed decedent a duty of care.

In support of this argument, plaintiff relies on a handful of cases applying this framework to entirely different situations concerning whether independent contractors could be held liable for injuries caused by their own actions.  See Church ex rel. Smith, 99 N.Y.2d at 111 (concerning injuries allegedly caused by the negligence of a contractor and sub-contractor); Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 142 (2002) (same); Occhino v. Citigroup Inc., No. 03-cv-5259, 2005 WL 2076588, at *6 (E.D.N.Y. Aug. 26, 2005) (same) (citing Espinal, 98 N.Y.2d at 141–142).

Plaintiff provides no explanation why her proposed framework should apply here.  By its very terms, that framework is suited only to analyzing the question whether a contractor owed a duty of care to a third party; any attempt to apply it to the question before the Court is awkward at

best and nonsensical at worst, and plaintiff cites no cases applying this framework to claims of negligence by the landowner, rather than by the contractor.  More specifically, the plaintiff cites no cases applying this framework in the context of a claim against the government under the FTCA, and the Court is unaware of any such case.

In short, the Court finds that plaintiff's proposed framework is not the appropriate test for whether the government owed the decedent a duty of care.  Instead, the Court looks to New York law more generally.

### b.  The Government Did Not Owe The Decedent a Duty of Care

In determining whether a duty exists under New York law, "courts must be mindful of the precedential, and consequential, future effects of their rulings."  Lauer v. City of N.Y., 95 N.Y.2d 95, 100 (N.Y. 2000).  Under New York law, courts determining the existence of a duty of care must "balance[e] factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."  Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d 222, 232 (N.Y. 2001) (quoting Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 586 (N.Y. 1994)).  New York courts have recognized that "[f]oreseeability, alone, does not define duty" and that "[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm."  Hamilton, 96 N.Y.2d at 232 (quoting Lauer v. City of N.Y., 95 N.Y.2d 95, 100 (2000); Pulka v. Edelman, 40 N.Y.2d 781, 785 (1976)).

Each and every one of these factors weighs against a finding that the government owed the decedent a duty of care.  First and foremost, the "reasonable expectations" of the parties here are set out by the contracts between the government and its contractors.  The RMACC and Task Order explicitly and unambiguously delegated all safety responsibilities to Campbell and any sub-

contractors, mandating, among other things, that no cutting or other "hot work" be performed until a tank was "cleaned so thoroughly as to make absolutely certain that there are no flammable materials present or any substances such as greases, tars, acids, or other materials which when subjected to heat, might produce flammable or toxic vapors."   (See RMACC; 29 C.F.R. 1910.252(a)(3)(i).)  As such, all parties reasonably expected East End to clean the 1,500 gallon tank thoroughly before any employee cut into it, regardless of whether the tank contained Number 2 Fuel Oil, gasoline, or some combination of the two.

This reasonable expectation cuts against a finding that the government owed the decedent any duty of care.  The government had no reason to determine the precise contents of the 1,500 gallon tank and, even if it was aware that the 1,500 gallon tank might have contained small amounts of gasoline, the government reasonably expected its contractors to fulfill their contractual obligations, which would have completely eliminated any risk of explosion.

Next, the "risk and reparation allocation" here is not disproportionate.  Although the disposal of fuel tanks carries a certain amount of risk, the government included health and safety provisions in the RMACC and Task Order that were intended to limit that risk.  Indeed, Francis Rooney conceded that the required safety procedures "would have eliminated the risk of an explosion" had they been followed, regardless of the contents of the tank.  (Rooney Aff. ¶ 8.) Further, the decedent was employed by an independent contractor for the purpose of disposing of fuel tanks; he is not an uninvolved passer-by.  The contractual allocation of risk between the government and the contractors took the health and safety of such employees into account by mandating that contractors follow all applicable safety standards.

Because the RMACC and Task Order specifically delegated all responsibility for ensuring safety to the contractors, and because the contractors and their employees are professionals

engaged in the disposal of fuel tanks, the allocation of the risk between the decedent, the contractors, and the government is not disproportionate.

The Court considers the remaining factors—the proliferation of claims, the likelihood of unlimited or insurer-like liability, and public policies affecting the expansion or limitation of new channels of liability—in light of the government's sovereign immunity. Although the FTCA waives that immunity where the negligence of a government employee causes an injury, that waiver must "be strictly construed in favor of the government." Liranzo, 690 F.3d at 84 (internal quotations omitted). To find that the government owed a duty of care to third parties here—where it had gone to great lengths to delegate all safety responsibilities to its contractors—would result in a dramatic expansion of the government's duty of care to third parties. This may lead to a proliferation of claims against the government and would increase the likelihood of liability in a wide and unpredictable range of circumstances. The public policy underlying the FTCA's narrow waiver of sovereign immunity weighs heavily against such an expansion.

In short, all of these factors weigh against finding that the government owed the decedent a duty of care under New York law. As such, the Court finds that the government did not owe the decedent a duty of care in connection with ensuring the safe disposal of the 1,500 gallon tank.

### c.  <u>Plaintiff Cites No Cases That Support Her Position</u>

As discussed above, all of the cases on which plaintiff relies in support of her argument for the existence of a duty of care are entirely distinguishable, and the Court declines to apply the framework employed in those cases to the facts here. Critically, none of those cases concern the FTCA. Beyond those cases, plaintiff relies largely on a single FTCA case: <u>Suro v. United States</u>, 107 F. Supp. 2d 206 (E.D.N.Y. 2000). Plaintiff apparently relies on <u>Suro</u> because it is one of very few cases imposing tort liability on the government in spite of a broad delegation to an independent contractor, but <u>Suro</u> is distinguishable from the situation before the Court for a number of reasons.

Suro concerned a government-owned apartment building that was managed by an independent contractor. A tenant in that building sued the government for injuries to her infant child that occurred when the child ingested lead paint found in the apartment. The court held that, although the government was not liable for the negligence of its contractor, it was subject to suit based on the allegation that a government employee knew that the child was living in the building and failed to notify the contractor. Id. at 208. The plaintiff here argues that, just like the contractor in Suro, East End and the decedent had no notice that the 1,500 gallon tank contained gasoline because the government failed to notify them of this fact. (See Pl's Opp. at 14.) Plaintiff glosses over several important differences between Suro and the case before the Court.

First, the Suro court found that the government had an affirmative duty to remediate lead paint conditions in apartments containing children. Suro recognized that New York law "requires an owner of a multiple dwelling to 'remove or cover' any paint containing specified levels of lead in any dwelling unit in which a child of six years of age or under resides." Suro, 107 F. Supp. 2d at 208. Thus, in Suro, unlike here, the government owed a specific, statutory duty of care to the plaintiff. Plaintiff has not advanced any cogent argument that such a duty exists here.

Second, the Suro court recognized that the duty to remove or cover lead paint applied only to apartments containing children. Thus, the fact that the contractor was unaware that a child lived in one of the apartments meant that it was unaware of its obligation to remove the paint. In effect, the government's failure to notify the contractor in Suro was analogous to a failure to delegate the obligation to remove lead paint in that apartment.

Here, plaintiff argues that East End was unaware "that special precaution should be taken" in order to thoroughly clean the 1,500 gallon tank because the government failed to inform East End "of the possibility that the tank contained gasoline." (Pl's Opp. at 14.) Unlike in Suro,

however, East End was contractually obligated to clean the tank so thoroughly as to ensure that no residue remained in the tank, regardless of the original contents.  (See RMACC; 29 C.F.R. 1910.252(a)(3)(i).)  Thus, plaintiff's argument that East End would have taken "special precautions" fails because it was already required to take those precautions, even absent any disclosure by the government.  For this reason, Suro is inapposite.

Finally, the court in Suro based its decision, at least in part, on the fact that the government had "notif[ied the contractor] on other occasions when it discovered that there were problems on the premises that needed to be repaired" and also that the government had informed tenants that they could contact government employees if they needed help resolving any problems.  Suro, 107 F. Supp. 2d at 208.  As a result, the government had taken on a duty to continue to relay such information to the contractor.  By failing to notify the contractor that an infant was living in one of the apartments, the government breached that duty.  Here, by contrast, plaintiff has not alleged that the government had taken on any such duty.

In addition to Suro, plaintiff relies on one other FTCA case: Miller v. George Arpin & Sons, Inc., 949 F. Supp. 961 (D.R.I. 1997).  The plaintiff in Miller was a visitor in a government building who sued the government after being injured by tripping over a piece of metal.  Id.  The Miller court allowed the plaintiff to sue the government based on a finding that Rhode Island law imposed an affirmative duty of care on the government with respect to all persons lawfully on its premises and that the government had not fully delegated that duty to its contractor.  Id.  As such, the government had retained a duty of care to the plaintiff.  Thus, Miller lends no support to plaintiff's argument that the government in this case owed the decedent a duty of care because here, unlike in Miller, the government has unambiguously delegated full responsibility.

16

In opposition to plaintiff's argument, the government cites a number of FTCA cases that support a finding that the government owed no duty of care to the decedent.

For instance, the government cites Loew v. U.S. Postal Serv., which concerned a suit by a pedestrian injured after tripping on an allegedly defective staircase on government property. No. 03-cv-5244, 2007 WL 2782768 (E.D.N.Y. Feb. 9, 2007). At the time of the accident in Loew, the government had delegated full safety responsibility to an independent contractor who was renovating the property. Id. at *2. The plaintiff argued, however, that her injury was caused by a structural defect that had existed prior to the commencement of the renovation project and, therefore, was the result of government negligence. Id. at *7.

The Loew court disagreed, stating that even an "original negligent act" by the government was insufficient to establish that the government owed a duty of care to the plaintiff. Id. That is because, at the time of the accident, the independent contractor was "indisputably charged with the maintenance and safety of the premises" and it was therefore the contractor's responsibility to ensure that the premises were safe, "regardless of whether or not the government was originally negligent." Id. Loew thus supports the proposition that the government does not owe a duty of care to third parties where it has completely delegated its duties related to safety, even if it is foreseeable that an earlier action by the government might injure a third party. See also Hamilton, 96 N.Y.2d at 232 ("Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm").

The government's other cited cases also support the proposition that the government owes no duty of care to third parties when it completely delegates relevant safety responsibilities to an independent contractor, even if it had failed to notify the contractor of a dangerous condition. See, e.g., Squicciarini v. United States, No. 12-cv-2386, 2013 WL 620190, at *6

17

(S.D.N.Y. Feb. 15, 2013) (finding that the government's alleged failure to inform an independent contractor of a potentially dangerous situation on a sidewalk did not constitute negligence where the "clear and unambiguous terms" of the contract delegated full responsibility for maintaining the sidewalk to the contractor); Diaz v. U.S. Postal Serv., No. 02-cv-8892, 2003 WL 21767530, at *3 (S.D.N.Y. July 31, 2003) (finding that the government's alleged failure to inform an independent contractor of a potentially dangerous accumulation of ice under the contractor's scaffolding did not constitute negligence where the contractor was "responsible for the safety of people walking underneath the scaffolding").

In short, the government had no duty of care towards the decedent. The contractors—not the government—bore all responsibility for ensuring compliance with applicable safety standards, and East End was obligated to clean the tank thoroughly prior to cutting, regardless of the contents. Plaintiff's claims thus fall outside of the FTCA's limited waiver of sovereign immunity, and the Court lacks subject matter jurisdiction.

### d. Even Assuming that the Government Owed The Decedent a Duty of Care, Plaintiff Has Not Alleged a Breach

As noted above, the Court finds that the government did not owe the decedent any duty of care. Even if the Court were to find such a duty to exist, however, the scope of that duty must be determined by the reasonable expectations of the parties. See Hamilton v. Beretta U.S.A. Corp., 96 N.Y.2d at 232. Thus, any duty of care would take into account the fact that the government had delegated all responsibility for ensuring the safe disposal of the used fuel tanks to the contractors and required that the tanks be thoroughly cleaned prior to cutting, regardless of their contents. Even assuming that the government owed plaintiff's decedent some duty of care, therefore, that duty would not encompass the safety responsibilities that the government had delegated to its contractors.

Plaintiff argues that the government breached its assumed duty of care in two ways. First, plaintiff argues that the government breached its duty by "allowing a fuel storage tank. . . intended to house only #2 fuel oil, to become contaminated with highly flammable and combustible gasoline." (Pl. Opp. at 18.) Second, plaintiff argues that the government breached its duty by "representing [the contents of the tank] to be #2 fuel oil" and by "failing to remedy or warn anyone of this dangerous condition." (Id.)

Both of these alleged actions concern the safe disposal of used fuel tanks. The government delegated all such responsibilities to the contractors; they—not the government—were obligated to clean the tanks thoroughly prior to cutting, regardless of the contents of the tanks. As such, the government had no obligation to determine the precise contents of the tank. Further, the government's representation concerning the contents of the tank had no bearing whatsoever on the procedures which the contractors were obligated to follow.[5]

In short, even assuming that the government owed the decedent a duty of care under New York law, plaintiff has not alleged a breach of that duty because—regardless either of the contents of the 1,500 gallon tank or of any representation by the government—the contractors were fully responsible for the safe disposal of the tank.

### 3.  **The Plaintiff Is Not Entitled to Additional Discovery**

Plaintiff has requested the opportunity to conduct additional discovery on the issue of subject matter jurisdiction. Specifically, plaintiff seeks discovery into "whether the defendant created the dangerous condition (gasoline in the tank) and/or had actual or constructive notice that

---

[5] The Court finds that even an affirmative representation by the government that the 1,500 gallon tank contained only Number 2 Fuel Oil would not constitute a breach of any duty of care to the decedent. The Court notes, however, that it is not at all clear that the plaintiff has alleged such an affirmative representation. Instead, the government's alleged representation appears to consist only of a note in the Task Order describing the tank as the "#2 oil tank"—nowhere does plaintiff allege that the government affirmatively represented that the 1,500 tank contained nothing but #2 fuel oil. (See, e.g., Task Order at USCG-PROV02_04403.)

the tank contained gasoline, as well as whether defendant failed to notify anyone" of that condition. (Pl's Opp. at 13.)  For the purposes of the instant motion, the Court has assumed all of the facts that plaintiff seeks to prove.  Even on such assumptions, plaintiff has not alleged that the negligence of a government employee caused the accident that killed her decedent.

Because plaintiff has not demonstrated any likelihood that her requested discovery will yield facts other than those already assumed, her request for additional discovery is denied.

### 4.  <u>Non-Delegable Duties Cannot Support Subject Matter Jurisdiction</u>

Finally, plaintiff argues that the government can be held liable "for the fault of the independent contractors" under a New York rule that an employer is liable for the negligence of its contractors where it "knows or has reason to know" that the work to be performed "involves special dangers."  (Pl's Opp. at 20–21.)

This argument is a non-starter.  As the government rightly notes, such "non-delegable duties may not be used as a means to impose liability on the Government under the FTCA."  (Def's Reply at 6; quoting <u>Moreno v. United States</u>, 965 F. Supp. 521, 526 (S.D.N.Y. 1997).)  Regardless of "the label which a plaintiff applies to a pleading," the federal government has not waived its immunity to strict liability claims.  <u>Flanagan v. United States</u>, 430 F. Supp. 2d 106, 115 (W.D.N.Y) (quoting <u>Johnson v. United States</u>, 547 F. 2d 688, 691 (D.C. Cir. 1976)).

Plaintiff argues that the government should be held strictly liable for the negligence of any of its independent contractors in situations where "special dangers" are involved.  This is patently improper and would effect a dramatic expansion of the FTCA's waiver of immunity.  The fact that plaintiff cites no FTCA cases—and, indeed, no federal cases whatsoever—in support of her argument only strengthens this conclusion.  The plaintiff cannot use the existence of non-delegable duties under New York law to impose liability on the government, and this Court cannot exercise subject matter jurisdiction by virtue of such non-delegable duties.

### III.    CONCLUSION

For the reasons set forth above, defendant's motion to dismiss for lack of subject matter jurisdiction is granted.  The Clerk of Court is directed to enter judgment accordingly and close the case.

**SO ORDERED.**

Date: March 20, 2017
Central Islip, New York

_____/s/ (JMA)_____
Joan M. Azrack
United States District Judge

21